[Civ. No. 1723.  Third Appellate District.—December 3, 1917.]

## E. G. CARR, Respondent, v. SACRAMENTO CLAY PRODUCTS COMPANY (a Corporation), Appellant.

CONTRACT—PERSON NOT ADJUDGED INSANE—RESCISSION.—In order for a person to avail himself of section 39 of the Civil Code, which provides that a conveyance or other contract of a person of unsound mind but not entirely without understanding, made before his incapacity has been judicially determined, is subject to rescission as provided in the chapter on rescission of such code, it is not necessary for a person to be incompetent to make any kind of contract or to transact any business, however simple, but the test is as to whether he was mentally competent to deal with the subject before him with a full understanding of his rights, and of the nature, purpose, and effect of the contract.

ID.—RELEASE FOR PERSONAL INJURIES—RESCISSION—APPEAL—REVIEW OF EVIDENCE.—In determining whether a trial court was justified in finding that an employee seeking to avoid a release for injuries was mentally incompetent, the evidence must be regarded in the light most favorable to such conclusion.

ID.—CANCELLATION OF RELEASE—SUFFICIENCY OF EVIDENCE.—A release of damages for personal injuries obtained from an employee enfeebled mentally and physically, unable to work, and without financial resources, for an inadequate amount, upon the misrepresentation that the employee was only entitled to a certain amount under the Employers' Liability Act, is properly set aside on the ground of fraud.

ID.—DELAY IN BRINGING ACTION—LACK OF LACHES.—An employee who delayed bringing an action to rescind a release of damages for per-

sonal injuries upon the advice of an attorney that he had no case cannot be held guilty of laches, where he subsequently consulted another attorney who advised him that he had a case, and brought suit to rescind within three weeks thereafter, the other party to the release having suffered no prejudice from the delay.

ID.—LACHES QUESTION OF FACT.—The question of laches in bringing an action is primarily a question for the trial court, and the solution of the question depends upon the particular circumstances of each case.

APPEAL from a judgment of the Superior Court of Sacramento County, and from an order denying a new trial. Martin I. Welsh, Judge.

The facts are stated in the opinion of the court.

Myrick & Deering, and James Walter Scott, for Appellant.

Downey, Pullen & Downey, and Donald McKisick, for Respondent.

BURNETT, J.—The action was for damages resulting from an injury suffered by plaintiff through the negligence of defendant. The cause was tried before the court without a jury, and the plaintiff was awarded the sum of seven thousand five hundred dollars, and the appeal is from the judgment and order denying the motion for a new trial. It is not disputed that the evidence was sufficient to justify a finding that the defendant was negligent as charged in the complaint. In fact, the court found that it was a case of *gross* negligence, and this finding is not attacked. There is no claim that plaintiff was chargeable with contributory negligence nor is there any contention that the amount awarded is excessive. The only points insisted upon by appellant are that it has been released from all liability for the accident by virtue of the payment of a certain sum of money to plaintiff in accordance with an agreement executed by the parties hereto and that plaintiff was guilty of laches in rescinding said release. It will be necessary, therefore, to set out the facts only in so far as they bear upon these defenses. As to the alleged release the court found: "That plaintiff signed said alleged release on August 29, 1913, at the request of defendant; that said defendant at said time for the purpose of inducing plaintiff to execute said alleged release, and in order to obtain from plaintiff a release of all liability to

plaintiff on account of injuries sustained by plaintiff through the negligence of defendant on or about the nineteeth day of July, 1913, willfully, falsely, and fraudulently represented to plaintiff that defendant's liability to plaintiff was limited by law to sixty-five per cent of plaintiff's wages for a period of twelve weeks and one hundred dollars hospital, medical, and surgical bills, and that there was in existence in California a law limiting defendant's liability to plaintiff to $217. The court finds that plaintiff did rely upon said representations and each of them, and did believe said representations and each of them to be true, and by reason of believing and relying upon said representations and each of them, did sign said alleged release; that said representations and each of them so made as aforesaid were false, fraudulent, and untrue and were known to defendant to be false, fraudulent, and untrue when made; that the consideration, to wit, $217, paid to plaintiff by defendant for said alleged release was grossly inadequate consideration; that on the date of the signing of said alleged release by plaintiff and for some time prior thereto, and continuously subsequent thereto, to wit, until about the first day of May, 1914, plaintiff was by reason of bodily injuries and because of surgical operations and of sickness, worries, and troubles, of great weakness of mind, and was so enfeebled and weakened mentally and physically that he did not have sufficient mental capacity or sufficient physical energy to transact the business of negotiating said alleged release, and he did not have sufficient mental capacity to understand the nature, purpose, and effect of said alleged contract of release or of the rights arising in his favor because of said personal injury by him sustained on July 19, 1913; that defendant well knew on said twenty-ninth day of August, 1913, of said weak mental and physical condition of plaintiff, but nevertheless induced plaintiff to sign said alleged release, and insisted that plaintiff sign said alleged release; that on or about the 1st of April, 1914, plaintiff first became aware of the facts which entitled him to rescind said alleged release, and first became aware of his right to rescind said alleged release." Then follows a finding that within a reasonable time thereafter plaintiff rescinded said release and offered to return the $217, together with interest thereon. The foregoing constitute the only findings that are seriously contested herein by appellant. It is claimed by respondent,

in the first place, that by reason of weakened mentality and of his inability to understand the nature, purpose, and effect of said release Carr, by virtue of the provisions of section 39 of the Civil Code and in harmony with the decisions construing said section, was authorized and permitted to rescind the release and to be restored to his former status. Said section provides: "A conveyance or other contract of a person of unsound mind, but not entirely without understanding, made before his incapacity has been judicially determined, is subject to rescission, as provided in the chapter on rescission of this code." It is contended—and rightly so—that to avail himself of this statutory remedy, it is not necessary for a person to be incompetent to make any kind of a contract or to transact any business however simple, but the test is: Was the party mentally competent to deal with the subject before him with a full understanding of his rights? (*Union Pacific Ry. Co.* v. *Harris,* 158 U. S. 326, [39 L. Ed. 1003, 15 Sup. Ct. Rep. 843].) Did he actually understand the nature, purpose, and effect of the contract? (*Jacks* v. *Deering,* 150 Cal. 272, [88 Pac. 909] ; *Perkins* v. *Sunset Tel. & Tel. Co.,* 155 Cal. 712, [103 Pac. 190] ; *Edmunds* v. *Southern Pacific Co.,* 18 Cal. App. 532, [123 Pac. 811].) Such is the question to be determined by the court or jury, and if there is found in the evidence any rational ground for holding that the person executing the release was thus mentally deficient, his contract may be avoided. In determining whether the court was justified in so finding as to Carr, we must, of course, regard the evidence in the light most favorable to such conclusion.

His physician, Dr. Charles B. McKee, testified that plaintiff was suffering from traumatic hysteria, bordering on melancholia; that he complained of disorders in digestion, did not sleep well, did not care for social intercourse with friends or relatives, was depressed, had financial worries, did not seem to carry on conversation to any extent, "on account of his injury which resulted in more or less depression—traumatic hysteria; for that reason I do not think that the man was in a position to judge the result of the form of this contract"; his nervous condition had some effect upon his will power; "his mental condition was certainly abnormal" from August 15, 1913, to May, 1914. An expert witness for the defendant, Dr. Dargitz, in answer to a hypothetical question based upon facts as testified to by plaintiff's witnesses, declared that such

condition might result in traumatic neurosis, and that in his opinion "a person afflicted with traumatic neurosis would not be competent to transact business if the affliction was very well defined." Mrs. Carr, plaintiff's wife, testified that normally her husband was a jolly, healthy, sociable man, but predisposed to nervous disorder; "at times he was almost bordering on insanity"; just before the accident his mental condition was good; shortly after leaving the hospital the first time and before the release was given he became depressed and declined to converse with her. He would shun his neighbors, whom he had previously been glad to see; he took no interest in home matters and neglected his personal appearance, "he was nervous, forgetful, stupid, and dull, and would hardly sleep. At the time the release was executed he was morbid and melancholy and did not seem to be in a fit condition to transact business of any importance." She further testified that this condition continued until a short time before the trial. Carr himself testified to certain facts along the same line. It is true that certain circumstances were elicited by appellant tending strongly to a contrary conclusion, but we think the evidence is such that we are precluded from disturbing the finding of the trial court. No doubt the complexity of the situation involving serious legal propositions, such as the doctrine of actionable negligence and the interpretation of certain provisions of the Employers' Liability Act of 1911, [Stats. 1911, p. 796], was carefully considered by the trial judge in determining the competency of Carr's impaired intelligence to understand the nature and effect of the release.

Again, there is reason for the contention of respondent that the release was fraudulent under section 1572 of the Civil Code, as virtually found by the court. The plaintiff testified in reference to the transaction as follows: "Mr. Ayre went and figured out and said I was entitled to twelve weeks, sixty-five per cent of my wages for twelve weeks, and wanted to know what I thought in regard to it. I told him that I was not satisfied. Mr. Walton spoke up, he says: 'Don't you think you will get well in that time?' I told him I hadn't any information of my being well, I had no authority on it, and he went to work and cited a case which was either his grandson or his own son that had a fracture of the forearm and went back to work in twelve weeks. Mr. Ayre said in addition to the sixty-five per cent of my wages they would

pay the hospital bill, which was $96.40, and he says, 'In no event do we allow more than one hundred dollars for hospital and medical fees,' and said that I was getting all that I was entitled to under the act, which was twelve weeks, he said, sixty-five per cent of my wages for twelve weeks was all I was entitled to under the act. He said—he took out his watch and looked at it—he said he would have to catch the train for San Francisco at 3:30, he says to hurry, 'Do you want to take that or do you want to sue the company?' 'Now,' he says, 'if you sue the company, it will be a long drawn-out proposition; aside from that we have a signed statement from the foreman that it was entirely your own fault you got hurt.' I did not see any use in my beginning suit against the company when I was only entitled to twelve weeks pay at sixty-five per cent, so therefore I, under those conditions, why, I did not see where I had any advantage in bringing a suit, and settled. I certainly believed the statement Mr. Ayre made to me.''

Mr. Ayre was familiar with said employers' liability law and he knew that appellant had not elected to accept the compensatory provision of that act and that neither party was subject to that portion of the law. He knew that plaintiff was not restricted for his damages to sixty-five per cent of his wages during a period of twelve weeks, and he was acquainted with the laws relating to personal injury and the right of plaintiff to damages as it existed in this state at that time. On the other hand, plaintiff testified that he was entirely ignorant of all these matters. We must therefore accept this as the situation: The representations, as found by the court, were made by appellant; as to the compensation to which respondent was entitled said representations were false and known by appellant to be false, and they were made for the purpose of deceiving respondent; plaintiff relied upon said representations and he was induced thereby to execute the release in question. Thus is the case brought within the provisions of said section 1572.

Against this conclusion the point is made that "a contract of settlement, like any other written contract, can only be impeached for fraud by clear and convincing evidence.'' No doubt such is the case, but the rule is for the guidance of the jury or trial judge, and it has no place in the consideration of an appellate court. Therein no difference between this

class of cases and others is recognized as to the sufficiency of the evidence to support the finding. (*Mattson* v. *Eureka Cedar Lumber & Shingle Co.*, 79 Wash. 266, [140 Pac. 377].)

It is contended, also, that if any misrepresentation was made, it merely related to a question of law, which cannot be regarded as fraudulent. But as pointed out by respondent, the representations may be considered as involving a matter of fact, because they implied that defendant had accepted the optional compensatory features of said Employers' Liability Act, and, therefore, the statement that said law limited the liability of defendant—which under some circumstances might be the expression of a mere opinion not constituting the basis for an action—was herein a false and fraudulent statement of a condition that did not exist. The representations of appellant were in effect, therefore, the same as though it had positively stated to respondent that the former had accepted said compensatory provisions, and, therefore, its liability was limited as provided in said act; and, hence, it cannot be said that we are dealing with a mere matter of opinion or question of law. Neither can it be doubted that the representations were such that respondent was justified in relying upon them. The matter was peculiarly within the knowledge of appellant, and the circumstances surrounding the transaction did not exact of respondent the duty of making an independent investigation. In some cases, of course, a party relies upon false representations at his peril, but we are not confronted with that situation. Our attention has been called to a long number of cases supporting respondent's position, but it is sufficient probably to cite *Brandt* v. *Krogh*, 14 Cal. App. 39, [111 Pac. 275]; *Browne* v. *San Gabriel River Rock Co.*, 22 Cal. App. 682, [136 Pac. 542, 544]; *Henry* v. *Continental Bldg. etc. Assn.*, 156 Cal. 667, [105 Pac. 960]; *Barron Estate Co.* v. *Woodruff Co.*, 163 Cal. 561, [42 L. R. A. (N. S.) 125, 126 Pac. 351]; *MacDonald* v. *De Fremery*, 168 Cal. 189, [142 Pac. 73]; *Woods* v. *Wikstrom*, 67 Or. 581, [135 Pac. 192].

In the Henry case, *supra*, it is said: "A party inducing another to contract in reliance upon estimates or opinions professedly based upon alleged facts known to the party stating them to be nonexistent will not be permitted to escape responsibility by the plea that he was merely declaring his opinion."

In the Barron Estate Company case the following from Pomeroy's Equity Jurisprudence is quoted with approval: "Whenever a party states a matter which might otherwise be only an opinion and does not state it as the mere expression of his own opinion, but offers it as an existing fact material to the transaction so that the other party may reasonably treat it as a fact and rely and act upon it as such, then the statement clearly becomes an affirmation of fact within the meaning of the general rule and may be a fraudulent representation."

So it is true, as held in many cases, that the affirmation of belief is an affirmation of a fact, that is, of the fact of belief, and if it is "fraudulently made to mislead or cheat another to abuse his confidence, or to blind his judgment, it is in law and morals just as reprehensible as if any other fact were affirmed for the same purpose."

Furthermore, under section 1578 of the Civil Code, "mistake of law" may be a ground for setting aside a contract. The right may exist where there is a "misapprehension of the law by one party, of which the others are aware at the time of contracting, but which they do not rectify." There was ground for the trial court to conclude that Carr was ignorant of the law as already indicated, and that appellant had the information furnished by the statute, and the latter made no effort to rectify the former's mistake and misapprehension. The situation was emphasized, furthermore, by the circumstance that Carr was of impaired mentality, and appellant not only failed to inform him of his rights but intentionally deceived him as to the remedies available to him. As to this legal proposition, a host of witnesses might be summoned, but it can hardly be disputed. The matter is pretty fully covered by this quotation from 2 Pomeroy's Equity Jurisprudence, section 847: "The scope and limitations of this doctrine may be summed up in the proposition that a misapprehension of the law by one party of which the others are aware at the time of the entering into the transaction but which they do not rectify, is a sufficient ground for equitable relief. A court of equity will not permit one party to take advantage and enjoy the benefit of an ignorance or mistake of a law by the other, which he knew of and did not correct. While equity interposes under such circumstances it follows *a for-*

*tiori* that when the mistake of law by one party is induced, aided, or accompanied by conduct of the other more positively inequitable, and containing elements of wrongful intent, such as misrepresentation, imposition, concealment, undue influence, breach of confidence reposed, mental weakness, or surprise, a court of equity will lend its aid and relieve from the consequences of the error.''

Another consideration, suggested, indeed, by what has gone before, is sufficient to justify the court's action in setting aside said contract. It is embraced within the provisions of section 1575 of the Civil Code and is denominated ''undue influence.'' Such reason for relieving a party of his apparent contract may be found where one takes ''an unfair advantage of another's weakness of mind'' or ''a grossly oppressive and unfair advantage of another's necessities or distress.''

That plaintiff was enfeebled mentally and physically is a rational conclusion from the evidence. It further appears that he was in great financial distress. He was unable to work and had no financial resources. His wife was trying to keep the family alive by baking bread for the neighbors. Notice had been given him that he would be ejected from his home. He had no credit, and on the day the release was executed he had less than a dollar in the house. It appears that his hospital bill was $96.40 and the physicians' charge was $447. These things and others show, indeed, beyond question not only that he was financially embarrassed but that he was in the ''very depths of despair.'' And it may be said with equal propriety that there was ground for holding that appellant took an unfair advantage of his necessities. The method employed in securing the release, the misrepresentations that were made, the concealment of certain facts, the withholding of information as to the legal rights of plaintiff and the inadequacy of the consideration are all circumstances, among others, pointing to the conclusion that the conduct of appellant was unconscionable, and it could not be regarded with favor by a court of equity.

It is true that the law does not discourage settlements of controversies by agreement, and is disposed as far as possible to uphold them, but it is equally ready to relieve parties from fraud and imposition through which they have been induced to

barter away their rights. In cases like this especially, where the opportunity for over-reaching is so great, the law demands good faith on the part of the releasee and a full understanding on the part of the person injured as to his legal rights. (*Kansas City R. Co.* v. *Chiles,* 86 Miss. 361, [38 South. 498]; *Mattson* v. *Eureka etc. Shingle Co.,* 79 Wash. 266, [140 Pac. 377]; *McGrail* v. *Jersey Central Traction Co.,* 84 N. J. Eq. 261, [94 Atl. 81]; *Edmunds* v. *Southern Pacific Co.,* 18 Cal. App. 532, [123 Pac. 811]; *Russell* v. *Dayton Coal & Iron Co.,* 109 Tenn. 43, [70 S. W. 1].) In passing from this consideration we may state that it is manifestly immaterial whether plaintiff was actually physically incapable of transacting said business as found by the court. The important inquiry was as to his mental condition. Nor to support the judgment is it necessary to hold that appellant had actual knowledge of respondent's mental condition when the release was executed.

As to the defense of laches, neither can it be said that the court's finding is unsupported. Attention is called by respondent to these facts: Some time in November or December, 1913, Carr and his wife read a newspaper article concerning the Employers' Liability Act of 1911. This article stated that an employer was obliged to pay sixty-five per cent of the average weekly wages of an injured employee for a period depending on the length of disability. Carr thereupon consulted with an attorney, one W. T. Phipps, and the deputy labor commissioner, Mr. Blair. Mr. Phipps investigated the situation, found out that appellant had not elected to become subject to the compensatory provisions of said act, and that respondent had executed the release, and he advised Carr that he had no case, that he had better not "throw good money after bad." Respondent in following the advice of an attorney of the standing of Mr. Phipps can hardly be said to be guilty of inexcusable neglect. In his condition of ignorance of the law he was justified, therefore, in doing nothing further until at least he had reason to doubt the soundness of Mr. Phipps' opinion. But in the last of February, 1914, Mrs. Carr again read the clippings and consulted another attorney, Donald McKisick, who seems to have encouraged her in the matter, and after a consultation with Mr. Downey, the two attorneys reached the conclusion, and so advised Mr. Carr about the 1st of April, that he had a right to rescind the

release. On the 3d of April following, Mr. Downey wrote a letter to defendant repudiating on behalf of Mr. Carr the release, and asking that the matter be adjusted. On the 10th of April a letter containing a definite refusal to do anything further in the matter and an avowal to stand upon said release and to defend any action that might be brought by plaintiff was received from defendant. Notice of rescission was served on defendant April 23d following. Subsequently it developed that the full amount of the consideration for the release was not stated in the notice, and another notice stating the correct amount was served May 16, 1914, and suit was brought June 10, 1914.

In view of the foregoing, it cannot be said that plaintiff's delay was unreasonable. He acted promptly after ascertaining that he had a right to rescind. According to the testimony of Mr. Downey it was about the 1st of April when he informed Mr. Carr that he had a right to rescind, and there was, therefore, a delay of only about three weeks in giving the notice of rescission. This was certainly a case of acting with reasonable expedition after he was actually aware of his right to rescind. (*Hannah* v. *Steinman,* 159 Cal. 142, [112 Pac. 1094].) Whether or not a reasonable time has elapsed is a question of fact primarily to be determined by the trial court, and the solution of the question depends upon the particular circumstances of each case. (*Suhr* v. *Lauterbach,* 164 Cal. 591, [130 Pac. 2].) One important feature to be regarded is the consideration whether any damage has been suffered by reason of the delay. (*Cahill* v. *Superior Court,* 145 Cal. 42, [78 Pac. 467].) A delay of a short period may bar the right to rescind by reason of the prejudice caused thereby, but, on the other hand, relief may be granted after several years. (16 Cyc. 156.) Laches in legal significance is not mere delay, but delay that works a disadvantage to another. (*Chase* v. *Chase,* 20 R. I. 202, [37 Atl. 804].) It is manifest that in the case at bar the defendant was not prejudiced in any manner by the delay. It did not change its status. Indeed, no circumstance was disclosed that would make it inequitable to set aside said release upon the grounds hereinbefore stated.

It would certainly be an unusual thing for this court to hold that under the circumstances as detailed by the witnesses for

respondent his delay constituted such laches as to bar him from the right to bring an action or to rescind said release.

The judgment and order are affirmed.

Chipman, P. J., and Hart, J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on January 2, 1918, and a petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on January 31, 1918.